**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:15 CR 49 CDP / DDN |
| | ) | |
| RAMIZ ZIJAD HODZIC,  et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER AND RECOMMENDATION**
**REGARDING LAWFUL COMBATANT AFFIRMATIVE DEFENSE**

Before the Court are the pending original joint motion and supplemental motions of defendants Ramiz Hodzic, Sedina Hodzic, Nihad Rosic, Mediha Salkicevic, and Armin Harcevic to dismiss Counts 1 and 3 of the indictment based on the affirmative defense of lawful combatant immunity under Federal Rule of Criminal Procedure 12(b)(1) (Docs. 390, 393, 395) ("motion to dismiss"), as well as their motion for a hearing on the motion to dismiss.  (Doc. 415).  The pretrial matters were referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(b).

All five movant-defendants are charged in Count 1 with conspiring with one another, with Abdullah Ramo Pazara, and with others, beginning in May 2013 and continuing to the date of the indictment (February 5, 2015), to provide material support to terrorists, in violation of 18 U.S.C. § 2339A.  Defendants Ramiz Zijad Hodzic and Nihad Rosic are charged in Count 2 with conspiring with Pazara and others, beginning in April 2013 and continuing to the date of the indictment, to kill or maim persons in a foreign country, in violation of 18 U.S.C. §§ 956 and 2.  In Count 3, all five movant-defendants and Pazara are alleged to have provided material support to terrorists, from May 2013 to the date of the indictment, in violation of § 2339A.  (Doc. 1).

Defendants argue that the indictment must be dismissed for failing to state an offense, because the plain language of the indictment refers only to hostile acts that were part of lawful warfare against the regime of Syrian leader Bashar al-Assad, and support of these acts is therefore immune from prosecution under the lawful combatant immunity doctrine.   (Docs. 390, 393, 395).   The government argues that lawful combatant immunity is legally impossible to apply to these defendants, both because the Syrian civil war is a non-international armed conflict ("NIAC") and because the foreign terrorist organizations ("FTOs") defendants are alleged to have supported are categorically barred from receiving combatant immunity protection under United States interpretation of international law.  (Doc. 404).

The parties have proffered evidence in the form of exhibits and have proposed factual findings that support their respective positions on defendants' invocation of the lawful combatant immunity doctrine.   (Docs. 390, 404, 424, 425).   To the extent the parties submit website URLs and the websites' contents are not otherwise in the record, the Court takes judicial notice of the information on the websites under Federal Rule of Evidence 201(b)(2).   Accordingly, with the information thus proffered by the parties, the Court concludes that an evidentiary hearing is not required.  *See Covey v. United States*, 377 F.3d 903, 909-10 (8th Cir. 2004).

## 1.  Facts Relevant to Lawful Combatant Immunity Defense

1.  Abdullah Ramo Pazara was a Bosnian native who became a naturalized United States citizen.  (Docs. 390, Ex. 1 at 8; 424 at ¶ 21; 425 at 2, ¶ 1).

2.  Pazara left the United States and eventually travelled to Syria, arriving in or about July 2013.  (Docs. 390, Ex. 2 at 4; 424 at ¶¶ 22-23; 425 at ¶ 2).

3.  Pazara remained in Syria and the surrounding region from about July 2013 until his death in September 2014.  (Docs. 390, Exs.1-2; 424 at ¶¶ 22-42; 425 at ¶ 3).

4.  By April 2013 and through September 25, 2014, during the period alleged in the indictment, Syrian rebels had organized armies and commenced hostilities against the

Assad regime.   (Doc. 390 at 16-17) (citing Hamza Hendawi, *President Assad Acknowledges Struggle to Win Syria Civil War*, Independent (Aug. 29, 2012), https://goo.gl/OlAJFj; White House Press Release, *Remarks by the President to the White House Press Corps* (Aug. 20, 2012), https://goo.gl/GqS5ON; Anne Barnard & Hwaida Saad, *Rebels Gain Control of Government Air Base in Syria*, N.Y. Times (Aug. 5, 2013), https://goo.gl/Zcerx5; White House Press Release, *Statement by the President on Syria* (April 22, 2011), https://goo.gl/zGsoMY).

5.   On November 11, 2012, during the period of the alleged conspiracy, the Syrian rebels unambiguously declared their independence and cast off any allegiance to the Assad regime, forming a "National Coalition of Syrian Revolutionary and Opposition Forces."   (Doc. 390 at 15-16) (citing *The Syrian Opposition's Doha Agreement*, ArabSaga (Nov. 12, 2012), https://goo.gl/EkT6J0).

6.   This coalition committed to follow the laws of war.  (Doc. 409, n. 21) (citing Nat'l Coal. of Syrian Revolution & Opposition Forces, *FSA Proclamation of Principles*, https://goo.gl/7aJHdn).

7.   During the period of the alleged conspiracy, Syrian rebels occupied land in Syria and held it in a hostile manner.  (Doc. 390 at 15) (citing Khaled Yacoub Oweis, *Syria's Army Weakened by Growing Desertions*, Reuters (Jan. 13, 2012), https://goo.gl/G7Y2s2; David D. Kirkpatrick, *In Parts of Syria, Lack of Assistance "Is a Catastrophe,"* N.Y. Times (March 8, 2013), https://goo.gl/Z5a7Sg).

8.   During the period of the alleged conspiracy, the Assad regime and the rebels each received support from opposing international coalitions.  (Doc. 390 at 3, 20, 27, Ex. 1) (citing Scott Wilson & Joby Warrick, *Assad Must Go, Obama Says*, Wash. Post (Aug. 18, 2011), https://goo.gl/Rywu68; Eric Schmitt, *C.I.A. Said to Aid in Steering Arms to Syrian Opposition*, N.Y. Times (June 21, 2012), https://goo.gl/hdlvpr; Joanna Paraszczuk, *Video: Umar Shishani, the Caucasus Emirate & ISIS*, From Chechnya To Syria (Sept. 11, 2013), https://goo.gl/taJmtr).

9.   In July 2012, the United States Office of Foreign Assets Control granted a United States non-profit organization, the Syrian Support Group, Inc., a license to "export, reexport, sell, or supply to the Free Syrian Army ("FSA") financial, communications, logistical, and other services . . . in order to support the FSA."  Dep't of the Treasury, Syrian Sanctions Regulations License, License No. SY-2012-294747-1 (July 23, 2012), https://goo.gl/YSpgo1.

10.   In December 2012, President Barack Obama and deputy Secretary of State William J. Burns recognized the Syrian Opposition Council as "the legitimate representative of the Syrian people."  (Doc. 390 at 18) (citing Mark Landler & Michael R. Gordon, *Obama Says U.S. Will Recognize Syrian Rebels*, N.Y. Times (Dec. 11, 2012), https://goo.gl/GJJJDK; U.S. Dept. of State Press Release, *Remarks to the Friends of the Syrian People* (Dec. 12, 2012), https://goo.gl/QmjOc2).

11.   Before and during the period of the alleged conspiracy, the Executive Branch of the United States Government ("Executive" or "President") provided the Free Syrian Army with supplies and assistance in its military operations against the Assad regime. *See United States Recognizes Syrian Opposition as "Legitimate Representative of the Syrian People," Will Provide Small Arms and Ammunition to Opposition Forces*, 107 Am. J. Int'l L. 654 (2013); (Doc. 390 at 15-16) (citing Eric Schmitt, *C.I.A. Said to Aid in Steering Arms to Syrian Opposition*, N.Y. Times (June 21, 2012), https://goo.gl/hdlvpr; David D. Kirkpatrick, *In Parts of Syria, Lack of Assistance "Is a Catastrophe,"* N.Y. Times (March 8, 2013), https://goo.gl/Z5a7Sg).

12.   Before, after, and during the period of the alleged conspiracy, the Executive permitted United States citizens to travel to Syria and other civil conflicts to fight with non-terrorist military organizations.  (Doc. 409 at 12-13) (citing Jason Ritz & Joseph Young, *Transnational "Volunteers": America's Anti-ISIL Fighters*, War on the Rocks (Sept. 13, 2016), https://goo.gl/BCA6xF; Jen Psaki, *State Department Daily Briefing*, C-SPAN (Oct. 2, 2014), at 26:00-28:00, https://goo.gl/3dyACA).

13.  While participating in the conflict in Syria and the surrounding region, Pazara met and joined with persons from Bosnia, Montenegro, and elsewhere, and they affiliated themselves with and fought for various groups and organizations engaged in the conflict. (Docs. 424 at ¶¶ 25-41; 425 at ¶ 5).

14.  Defendants have produced reports from two investigators, Brian Williams and Chris Chang.  These investigators interviewed witnesses who had been on the ground with Pazara in Syria about the units in which Pazara fought.  (Doc. 390, Exs. 1-2).

15.  The investigators' reports state that Pazara initially joined the Free Syria Army, and then the Bosnian unit was placed under the command of Jaish al-Mujajireen wal-Ansar ("JMA" or "JAMWA"), still under the umbrella of the FSA, and in January 2014 he joined another group called the Bayt Commandos.  (Doc. 390, Ex. 1 at 3-4, Ex. 2 at 1-3).

16.  According to these reports and other evidence, these groups had commanders, carried arms openly, wore uniforms, and lived in barracks.  (Doc. 390 at 27, Ex 1 at 7-8, Ex. 2 at 5-7, Ex. 3) (citing Joanna Paraszczuk, *Who Are Jaish Al-Muhajireeen Wa Ansar?*, From Chechnya to Syria (Aug. 15, 2013), https://goo.gl/Pf7YkH).  The government has produced photos of Pazara wearing a uniform and carrying a gun openly. (Doc. 390, Ex. 3).

17.  The reports also indicate that Pazara's Bosnian unit was used largely for guard duty and was known to spend some of its time on Facebook or cooking.  (Doc. 390, Ex. 1 at 4-8).

18.  On September 24, 2014, President Obama declared JMA a "specially designated global terrorist."  *See* U.S. Dep't of State, *Designations of Foreign Terrorist Fighters* (Sept. 24, 2014), https://goo.gl/nrSwUu.

## 2.  Justiciability of Lawful Combatant Immunity Issue

In November and December 2015, defendants filed their initial motions to dismiss the indictment on several grounds, including the affirmative defense of combatant

5

immunity.  (Docs. 223, 225, 230, 236).  The undersigned recommended denying the motions to dismiss, but stated that a pretrial hearing might be conducted under Federal Rule of Evidence 104 to decide the legal and evidentiary sufficiency of the affirmative defense of lawful combatant immunity.  (Doc. 328).  Thereafter, defendants filed the pending motion to dismiss, invoking the doctrine of lawful combatant immunity. Defendants do not argue that the facts contained in the indictment fail to allege the essential elements of the crimes charged.  Instead, they argue that dismissal is warranted because they are shielded from prosecution by the doctrine of lawful combatant immunity.  However, and as the undersigned discussed in the previous Report and Recommendation, this is a fact-intensive inquiry that cannot be ruled in a motion to dismiss the indictment.  (Doc. 328 at 20).

In considering a motion to dismiss an indictment, district courts "accept the government's allegations as true, without reference to allegations outside the indicting document."  *United States v. Farm & Home Sav. Ass'n*, 932 F.2d 1256, 1259 n. 3 (8th Cir. 1991) (citing *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 (1952)). An indictment is not subject to dismissal on the ground that it is not supported by sufficient evidence.  *Costello v. United States,* 350 U.S. 359 (1956).  Accordingly, defendants' motions to dismiss the indictment on the grounds of an affirmative defense that cannot be resolved without resorting to facts outside of the indicting document are generally not well taken.

However, Federal Rule of Criminal Procedure 12(b)(1) permits parties to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."  A defense is capable of pretrial determination "if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity" of the motion.  *United States v. Covington*, 395 U.S. 57, 60 (1969).  The district court must rule on such a motion before trial unless there is "good cause to defer a ruling" and deferral will not "adversely affect a party's right to appeal." Fed. R. Crim. P. 12(d); *United States v. Turner*, 842 F.3d 602, 604–05 (8th Cir. 2016).

"Courts may consider evidence beyond the pleadings to make factual findings in pretrial orders." *United States v. Turner*, 842 F.3d 602, 605 (8th Cir. 2016). But courts may not make pretrial factual findings when an issue is "inevitably bound up with evidence about the alleged offense itself." *United States v. Grimmett*, 150 F.3d 958, 962 (8th Cir. 1998). Such a decision should be deferred to the finder of fact at trial. *Turner*, 842 F.3d at 605.

A review of the defendants' motion and the government's response reveals that the lawful combatant immunity defense has several factual facets. The initial question presented by the pending motion is whether these facts relevant to the defense are intertwined with elements of the underlying offenses and reserved for trial disposition.

## A.  The Offenses Charged

The essential elements of the Count 1 offense are that each defendant (1) knowingly conspired (2) to provide material support or resources, (3) knowing and intending that the support and resources were to be used in carrying out a violation of 18 U.S.C. § 956. 18 U.S.C. § 2339A(a); *United States v. Omar*, 786 F.3d 1104, 1112-13 (8th Cir. 2015).

The essential elements of the Count 2 offense are that defendants Ramiz Zijad Hodzic and Nihad Rosic each: (1) within the jurisdiction of the United States, (2) knowingly conspired with each other and others, (3) to commit acts outside the United States, (4) that would constitute the offense of murder or maiming if committed within the special maritime and territorial jurisdiction of the United States, and (5) that one or more of the conspirators committed an act within the jurisdiction of the United States to effect the object of the conspiracy. 18 U.S.C. § 956(a).

The essential elements of the Count 3 offense are that each defendant (1) knowingly and willfully provided and attempted to provide (2) material supplies and resources, (3) "knowing and intending that such support was to be used in preparation for, and in carrying out, a violation of 18 U.S.C. §956(a), that is, a conspiracy to commit

7

at places outside the United States acts that would constitute offenses of murder or maiming if committed in the special maritime and territorial jurisdiction of the United States, with one or more of the conspirators committing an act within the jurisdiction of the United States to effect the object of the conspiracy."  (Doc. 1 at 17-18); 18 U.S.C. §§ 956, 2339A(a).

### B.  Lawful Combatant Immunity Defense

The elements of the crimes charged in the indictment and the elements of the lawful combatant defense are not "bound up" with each other. *Grimmett* 150 F.3d at 962.

Lawful combatants enjoy "combatant immunity" for acts of warfare, including the wounding or killing of other human beings, "provided those actions were performed in the context of ongoing hostilities against lawful military targets, and were not in violation of the law of war." *United States v. Khadr*, 717 F. Supp. 2d 1215, 1221 (C.M.C.R. 2007).   The Third Geneva Convention Relative to the Treatment of Prisoners of War, 6 U.S.T. 3316 (Aug. 12, 1949) ("GPW") is a treaty that has been signed and ratified by the United States and incorporated extensively into United States law.  *See* U.S. Const. art. VI, cl. 2; Army Regulation 190-8, Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees § 1-6(a) (1997), https://info.publicintelligence.net/USArmy-Detainees.pdf.[1]

Under the GPW, a lawful combatant is generally only a member of regular armed forces of a party to an "international armed conflict" ("IAC"), including "members of militias or volunteer corps forming part of such armed forces."   GPW Arts. 2 and 4.

---

[1] "The traditional American respect for the rules of International Law was most clearly expressed in . . . the Paquete Habana Case [where] the Supreme Court declared that 'International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction, as often as questions of right depending upon it are duly presented for their determination.'"  Kurt von Schuschnigg, *International Law: An Introduction to the Law of Peace* 64 (Bruce Pub. Co. 1959) (quoting *The Paquete Habana*, 175 U.S. 677, 700 (1900)).

Members of other militia, volunteer corps, and organized resistance movements belonging to a State party in an IAC are considered lawful combatants if:

> (1) They are under the command of an individual who is responsible for his or her subordinates;
> (2) They wear a fixed, distinctive sign or symbol recognizable at a distance;
> (3) They carry weaponry openly; and
> (4) They conduct operations in accordance with the laws and customs of war.

*Khadr*, 717 F. Supp. 2d at 1221; *see also* GPW art. 4(a)(2), 6 U.S.T. 3316, art. 4(a)(2).

However, lawful combatant protections are not exclusively reserved for those fighting in IACs. The GPW makes lawful combatant immunity protections applicable to fighters in non-IACs "*as a minimum*," and encourages signatory states to extend such protections to non-IACs ("NIACs"). GPW art. 3 ("each Party to the [non-international] conflict shall be bound to apply, as a minimum" various provisions that relate to hostages, treatment of civilians, humanitarian aid, and war crimes).

American courts have applied international law principles, as codified in the GPW and in the customary international law of war preceding it, in certain NIAC cases, such as the Mexican Civil War, *Ex parte Toscano*, 208 F. 938, (S.D. Calif. 1913), and our own Civil War. *Ford v. Surget*, 97 U.S. 594, 605-08 (1878). At the same time, courts have consistently denied combatant immunity to members of designated foreign terrorist organizations, who did not qualify for lawful combatant status under the GPW. *See United States v. Hamidullin*, 114 F. Supp. 3d. 365, 380-81 (E.D. Va. 2015); U*nited States v. Lindh*, 212 F.Supp.2d 541, 558 (E.D. Va. 2002).[2]

---

[2] The government argues that even if Pazara was a lawful combatant, providing support to lawful combatants can, itself, violate federal law, citing 18 U.S.C. § 960:

> Whoever, within the United States, knowingly begins or sets on foot or provides or prepares a means for or furnishes the money for, or takes part in, any military or naval expedition or enterprise to be carried on from thence against the territory or dominion of any foreign prince or state, or of any colony, district, or people with whom the United States is at peace,

Accordingly, the issues pending before the Court are (1) whether the Syrian conflict is an IAC; (2) if it is not an IAC, whether United States interpretation of international law would nonetheless apply lawful combatant immunity protections to it; and (3) whether Abdullah Pazara, whom defendants allegedly supported, would be precluded from claiming lawful combatant status by his asserted membership in a foreign terrorist organization. These issues are not intertwined with the elements of the offenses alleged in the indictment.

Defendants' motion is appropriate for pre-trial resolution, to determine whether defendants may present this affirmative defense at trial. *See* Fed. R. Evid. 104; Fed. R. Crim. P. 12(b). To raise an affirmative defense at trial, defendants must show substantial evidence on each element of the affirmative defense. *United States v. Bailey*, 444 U.S. 394, 412 (1980); *United States v. Blankenship*, 67 F.3d 673, 678 (8th Cir. 1995). At trial, if an offer of evidence legally sufficient to sustain a verdict by a preponderance of the evidence is admitted, the burden shifts to the government to disprove the affirmative defense beyond a reasonable doubt. *United States v. Norton*, 846 F.2d 521, 524 (8th Cir. 1988) ("it is the better practice to include 'affirmative defense' instructions where submissible, in the verdict directing instruction").

## C. The Government's Political Question Argument

The government argues that the lawful combatant immunity defense is not justiciable, because the relevant substantive questions of whether an entity is a State and whether hostilities involving that entity constitute an international armed conflict are

---

shall be fined under this title or imprisoned not more than three years, or both.

18 U.S.C. § 960 (enacted June 25, 1948). (Doc. 404 at 11 n.4). The government's argument avoids the essential qualifier "*with whom the United States is at peace*" in suggesting that the present defendants could properly be prosecuted under § 960. In any event, the grand jury has not brought this charge against the defendants. So, the Court need not fully address this argument.

political questions reserved for the Executive and inappropriate for judicial determination.  (Doc. 404 at 20, 30) (citing *The Three Friends*, 166 U.S. 1, 63 (1897); *Padilla v. Rumsfeld*, 352 F.3d 695, 712 (2d Cir. 2003).  The government's argument does not succeed in this case, however.

The Supreme Court has held that, while many cases involving foreign relations pose non-justiciable political questions, "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance."  *Baker v. Carr*, 369 U.S. 186, 211 (1962).  The *Baker* Court explained that "recognition of belligerency abroad is an executive responsibility, but if the executive proclamations fall short of an explicit answer, a court may construe them . . . ."  *Id.* at 212-13 (citing *Three Friends*, 166 U.S. at 63, 66).

*Three Friends* held that the political question doctrine only forbids judicial challenges to executive recognitions or non-recognitions of belligerency; it does not stand for the proposition that a court cannot *interpret* executive actions to determine whether the executive branch has recognized belligerent status.  166 U.S. at 63-66.  On the contrary, the *Three Friends* Court stated the judiciary must accept the "political department" determination "according to the terms and intention expressed."  *Id.* at 63.  That Court determined the terms of the United States' relationship with another government by looking to formal proclamations and statements of the President and the Secretary of State.  *Id.* at 63-66.  President Cleveland had issued proclamations recognizing the existence of armed insurrection in Cuba and admonishing citizens to abstain from violating neutrality laws.  *Id.* at 64.  The Court determined that while the "political department ha[d] not recognized the existence of a *de facto* belligerent power," it "ha[d] recognized the existence of insurrectionary warfare."  *Id.* at 64-65.  The court was thus "judicially informed of the existence of an actual conflict of arms" and bound by the political department's statements.  *Id.*

This authority does not mean courts may declare war or review challenges to the executive's declaration of war.  In *Padilla v. Rumsfeld*, the Second Circuit stated that

11

"whether a state of armed conflict exists against an enemy to which the laws of war apply is a political question for the President, not the courts." *Padilla v. Rumsfeld*, 352 F.3d 695, 712 (2d Cir. 2003), *rev'd and remanded on other grounds*, 542 U.S. 426 (2004). The *Padilla* Court, however, was responding to the argument that an undeclared war existed between al Qaeda and the United States. *Id.* The *Padilla* Court held that the president, not the judiciary, decides whether this country will deploy military forces and that the propriety of such deployment is not open to judicial review. *Id.* (citing *Johnson v. Eisentrager*, 339 U.S. 763, 789 (1950) ("Certainly it is not the function of the Judiciary to entertain private litigation—even by a citizen—which challenges the legality, the wisdom, or the propriety of the Commander-in-Chief in sending our armed forces abroad or to any particular region.").

In this case, the Court is not being asked to make a diplomatic decision regarding the Syrian conflict. Instead, this Court is asked to infer what the diplomatic position of the United States was, during the relevant period, with regard to the Syrian conflict, from the Executive's statements and actions. Cases addressing this question indicate that the issue is justiciable, but with substantial deference to the Executive's determinations. In *United States v. Palmer*, Justice John Marshall explained the boundaries of judicial inquiry on these matters as follows: he noted that courts should look to whether the Executive has recognized the existence of the conflict, and,

> if the government remains neutral, and recognizes the existence of a civil war, its courts cannot consider as criminal those acts of hostility which war authorizes, and which the new government may direct against its enemy. To decide otherwise, would be to determine that the war prosecuted by one of the parties was unlawful, and would be to arrange the nation to which the court belongs against that party. This would transcend the limits prescribed to the judicial department.

16 U.S. 610, 634 (1818).

Similarly, in *The Ambrose Light*, the Southern District of New York held that courts may not inquire into whether belligerents "should" be recognized or not, but once belligerents are recognized by the United States or other nations, this "authorizes courts

12

of law to treat the insurgents as lawful combatants."  25 F. 408, 418-19 (S.D.N.Y. 1885). The *Ambrose Light* Court noted that political recognition of a state of belligerency may be express, implied, or tacit:

> In the absence of any recognition by foreign powers, or by our own government, it is clear from the above authorities that the court has no power to institute any inquiries into the status of insurgents in foreign countries, or to attempt to determine, or to lead the political department in determining, . . . whether the parties are 'enemies' or 'belligerents;' or whether the condition is that of armed rebellion merely.
>
> * * *
>
> Until some recognition by the political department, express, implied, or tacit, of new conditions in foreign states, there is no 'open war,' no 'belligerent;' there are no 'enemies' that the court can recognize, but only insurgents. . . .

*Id.* at 420.

> [Recognition] is express when made by a proclamation of neutrality . . . .  It is implied in a declaration of blockade . . . .  And when there is long acquiescence in belligerent acts affecting another nation's interests, without protest or objection, such as the blockade of ports, or the use of a nation's ports as a harbor for prizes, a tacit recognition of belligerent rights is to be reasonably inferred. . . .

*Id.* at 443.  That Court determined that the United States' continued commerce with ports controlled by rebels in Colombia, despite the Colombian government's attempts to close these ports, implied Executive recognition of the rebels as legitimate belligerents.  *Id.* at 443-47; *see also Santissima Trinidad*, 20 U.S. 283, 336-37 (1882) (recognizing a state of civil war between Spain and its colonies); *The Amy Warwick*, 67 U.S. 635, 668-69 (1862) (recognizing the Confederate States of America as "belligerents" in a civil war).

The indicia of executive intent with regard to the Syrian conflict, discussed *infra*, are substantial and sufficient for the Court to conclude that these questions are justiciable.

13

### 3.  DISCUSSION

The undersigned now takes up the issues regarding the substantive elements of the lawful combatant immunity defense.

### A.  Whether the Syrian Conflict Is An International Armed Conflict

The GPW applies to "all cases of declared war or of any other armed conflict which may arise *between two or more* of the High Contracting Parties."  6 U.S.T. 3318, art. 2 (emphasis added).  The armed conflict at issue here is between the state of Syria, which is a party to the GPW, and an army of rebels, which is not.[3]  The parties in this case do not appear to dispute that at all times relevant to the indictment the conflict was not an IAC, nor does the undersigned consider it an IAC.

Instead, defendants ultimately argue that the Syrian conflict is a civil war, with the rebels engaged in legitimate warfare that confers on them "belligerent" status, including the protections of lawful combatant immunity.  (Doc. 390).  Accordingly, a cardinal question for the Court is whether the Syrian conflict constitutes a belligerency or otherwise warrants the conferral of lawful combatant immunity protections.

### B.  Whether Lawful Combatant Immunity Is Applicable to the Syrian Conflict

The customary laws of war, including those involving lawful combatant immunity, apply during an armed conflict between a state and a belligerent.  Hans Kelsen, *Principles of International Law* 291-92 (Rinehart & Co. 2003).  The current doctrine of lawful combatant immunity is reflected in the GPW, which essentially codified the

---

[3] While not a signatory party to the GPW, the National Coalition of Syrian Revolutionary and Opposition Forces, a coalition of Syrian opposition groups, signed an agreement in Doha, Qatar, and issued statements committing itself to compliance with international law.  *See* Nat'l Coal. of Syrian Revolution & Opposition Forces, *FSA Proclamation of Principles*, https://goo.gl/7aJHdn (cited in Doc. 409, n. 21).  *See also The Syrian Opposition's Doha Agreement ("Doha Agreement")*, ArabSaga (Nov. 12, 2012, 8:40 AM), https://goo.gl/EkT6J0; (cited in Doc. 390, nn. 24-25).

international law of armed conflict.  (Doc. 404 at 13) (citing *Hamidullin*, 114 F. Supp. 3d at 380-81; *United States v. Pineda*, 2006 WL 785287, at *2 (D.D.C. 2006)).  Reported cases following the United States' ratification of the GPW have analyzed the lawful combatant immunity defense according to GPW standards.  *United States v. Hausa*, 258 F.Supp.3d 265, 273 n.6 (E.D. N.Y. 2017); *Lindh*, 212 F.Supp.2d at 553.

Additionally, the lawful combatant immunity doctrine has a long history outside of the GPW.  The doctrine finds its roots in common law principles and agreements between nations concerning the rights of enemy combatants during the conduct of war.  *See Pineda*, 2006 WL 785287 at *2; *Lindh*, 212 F.Supp.2d at 553.  In traditional international law, the legal status of an insurgent movement was usually determined by "the nature and extent of the insurrectionary achievement."  Charles Cheney Hyde, *International Law Chiefly as Interpreted and Applied by the United States*, Vol. 1, at 202 (2d ed., 1947), https://archive.org/details/internationallaw033123mbp.   If the parent State is able to rapidly suppress the insurgents, the event was described as an "insurgency."  *Id.*  But if the insurgents become a serious challenge to the government and achieve formal recognition as "belligerents," then the struggle between the two factions becomes the equivalent of war.  *Id.* at n.1 (citing *The Three Friends*, 166 U.S. 1, 63-64 (1897)).

Under historical international law, a non-state organization was a belligerent if: (1) there was a state of general, as opposed to localized, armed conflict; (2) the insurgent body established a governmental structure exercising control over a part of the national territory; and (3) the insurgent forces fought in accordance with the laws and customs of war.  Kelsen, *Principles of International Law* 291-92; Sandesh Sivakumaran, *The Law of Non-International Armed Conflict* 9-11 (Oxford U. Press 2012).

The Supreme Court has held that lawful combatant immunity extends to "belligerents" for acts of legitimate warfare in the context of a civil war.[4]  *See Ford v.*

---

[4] "Civil war is a classic example of a non-international armed conflict." *See Law of War Manual,* 1011 at § 17.111 (U.S. Dept. of Defense 2015).

*Surget*, 97 U.S. 594, 602 (1878).  The Court has held that a civil war constitutes "legitimate warfare," *i.e.* belligerency, when it meets the following test:

> When the party in rebellion [1] occupy and hold in a hostile manner a certain portion of territory; [2] have declared their independence; [3] have cast off their allegiance; [4] have organized armies; [5] have commenced hostilities against their former sovereign, the world acknowledges them as belligerents, and the contest a *war*.

*Amy Warwick*, 67 U.S. at 666-67.  Defendants have proffered evidence of these factors. (Doc. 390 at 15-17).

Defendants have shown that the United States Executive recognized the Syrian Opposition Council and the Free Syrian Army as a belligerent entity.  *See* pages 3-4, *supra*.  Recognition of a belligerent by others confirms the application of international law to an armed conflict between that entity and a state.  *See Law of War Manual,* 75-76, 1011 at § 17.111 (U.S. Dept. of Defense 2015)*;*  Yoram Dinstein, *Non-International Armed Conflicts in International Law* 111 (2014) ("'recognition of belligerency' . . . is usually deduced by implication.  There is no need for an express proclamation of [it] inasmuch as it may be distilled from the conduct of States."); *see also* Yair M. Lootsteen, *The Concept of Belligerency in International Law*, 166 Mil. L. Rev. 109, 118-19 (2000), https://www.loc.gov/rr/frd/Military_Law/Military_lAW/Review/pdf-files/277089"1.pdf.

"'[T]he applicable provisions [of the GPW] represent a compulsory minimum. The words 'as a minimum' [used in GPW Article 3] must be understood in that sense.  At the same time they are an invitation to exceed that minimum."  *Commentary on the Geneva Conventions of 12 August 1949: III Geneva Convention Relative to the Treatment of Prisoners of War* 38 (Jean S. Pictet ed., 1960), https://www.loc.gov/rr/frd/Military_Law/pdf/GC_1949-III.pdf.  "[I]f one Party to a conflict is recognized by third parties as being a belligerent, that Party would then have to respect the Hague rules."  *Id.* at 38.

> An internal conflict may, as it continues, become to all intents and purposes a real war.  The situation of thousands of sufferers is then such that it is no longer enough for Article 3 [which applies only to non-international armed

conflicts] to be respected.  Surely the most practical step is not to negotiate special agreements, but simply to refer to the Convention as it stands[.]

*Id.* at 42.

While the undersigned does not conclude that the Syrian conflict is an International Armed Conflict, it is factually analogous to non-IACs in which the United States recognized lawful combatant immunity for participating forces, especially civil wars.  In the United States Civil War, the United States treated Confederate soldiers as prisoners of war even though it did not recognize the Confederacy as a separate government, and in the Mexican Civil War, the United States applied the law of war to both sides even though it had not accorded official recognition to either party.  (Doc. 409 at 7-9) (citing Francis Lieber, *Instructions for the Government of the Armies of the United States in the Field*, art. 153 (1863), https://goo.gl/Gxv6rk; *Ex parte Toscano*, 208 F. 938, 939 (S.D. Cal. 1913)).

The United States viewed the Vietnam War as a conflict international in character.  Rymn J. Parsons, *Combatant Immunity in Non-International Armed Conflict, Past and Future*, 1 Homeland & Nat'l Security L. Rev. 1, 23-25 (2014) (citing *The Legality of United States Participation in the Defense of Viet-Nam*, 54 U.S. State Dept. Bulletin 474 (1966)).  As in Vietnam, in Syria there are two native factions each claiming *de jure* sovereignty over the entire state, each receiving support from opposing international coalitions.  *See id.*; (Doc. 390 at 3, 20 n. 66, 27, Ex. 1).

Defendants have proffered sufficient evidence of the circumstances of the Syrian conflict to indicate the viability of the lawful combatant immunity defense.  The United States recognized the Syrian opposition and its claim to *de jure* sovereignty as superior to that of the Assad regime during the periods relevant to the indictment.  The Executive not only recognized the Syrian opposition as the country's lawful authority and called for Bashar al-Assad to step down, it provided the Free Syrian Army with supplies and assistance in its military operations.  The American Executive granted a United States non-profit organization a license to support the FSA.  And it has routinely permitted

United States citizens to travel to Syria and other civil conflicts to fight with non-FTO military organizations. (Findings 9-13, above).

The undersigned concludes that the circumstances of the Syrian conflict indicate the potential application of the lawful combatant immunity defense.

### C. Whether Abdullah Ramo Pazara Was A Lawful Combatant

Defendants' entitlement to invoke the lawful combatant immunity affirmative defense depends ultimately on the question, For which faction of the Syrian opposition did Abdullah Ramo Pazara actually fight? Defendants argue that Pazara and the Bosnian unit he was in fought within or alongside the Syrian rebels engaged in legitimate warfare against the Assad regime. (Doc. 390 at 22-23). They argue that Pazara initially joined the Free Syria Army ("FSA"); and the Bosnian unit was subsequently placed under the command of Jaish al-Mujajireen wal-Ansar ("JMA" or "JAMWA"), still under the umbrella of the FSA. (Doc. 390, Ex. 1 at 4, Ex. 2 at 3). In January 2014, Pazara joined another group called the Bayt Commandos. (Doc. 390, Ex. 2 at 3). In support of these claims, defendants cite to the Doha Agreement, news articles, and the interviews of an investigator with people who were on the ground with Pazara.

The government argues that, even if combat against the Assad regime is otherwise lawful under the GPW, Pazara was not a lawful combatant, because he fought "in support of" certain FTOs. (Doc. 404 at 22). Foreign terrorist organizations are barred from claiming eligibility for combatant immunity. *See* 8 U.S.C. § 1189(a)(1); 18 U.S.C. §§ 2339A and 2339B; *cf., United States v. Mehanna*, 735 F.3d 32, 45 (1st Cir. 2013). This argument is consistent with United States jurisprudence following September 11, 2001. *See Lindh*, 212 F. Supp. 2d at 556; *see also Khadr*, 717 F. Supp. at 1221; *Hamidullin*, 114 F. Supp. 3d. at 380-81; and *Hausa*, 258 F.Supp.3d at 265.

The government and the defendants both cite *Lindh*, in which the defendant sought dismissal of certain counts charging him with participating in combat in foreign terrorist organizations and against American and allied forces. 212 F. Supp. 2d at 556. He argued

before trial that he was entitled to lawful combat immunity as a Taliban soldier.  *Id.*  In deciding that Lindh was not entitled to lawful combatant immunity status, that court considered five criteria: (1) the president's determination of the individual's combatant status, (2) whether the organization is commanded by a person responsible for subordinates, (3) whether the members have a recognizable, fixed emblem or uniform; (4) whether the members carry arms openly, and (5) whether the members conduct their operations in accordance with the laws and customs of war.  *Id.* (citing GPW art. 4(a)(2) for the latter four factors).

This Court can construe the United States' post-September 11 denial of lawful combatant immunity to members of FTOs in a manner that is consistent with America's obligations under the GPW.  *See Cook v. United States*, 288 U.S. 102, 120 (1933) ("A treaty will not be deemed to have been abrogated or modified by a later statute, unless such purpose on the part of Congress has been clearly expressed.").[5]  Such a construction is made relatively straightforward by considering GPW art. 4(a)(2)'s four-factor test, particularly its final factor (conducting operations in accordance with the laws and customs of war).  The practice of terrorism as defined by 18 U.S.C. § 2331 is inconsistent with the laws and customs of war, which demand adherence to the principle of distinction, which "requires belligerents to distinguish between civilian and military objects in attacks."  Jeffrey T.G. Kelsey, *Hacking Into International Humanitarian Law: The Principles of Distinction and Neutrality In The Age of Cyber Warfare*, 106 Mich. L. Rev., 1427, 1431 n. 23 (May 2008).  *See also Protocol Additional to the Geneva Conventions of 12 August 1949, and relating to the Protection of Victims of International Armed Conflicts (Protocol I),* art. 51, June 8 1977, 1125 U.N.T.S. 3 (No. 17512), https://www.icrc.org/eng/assets/files/other/icrc_002_0321.pdf; *see also*

---

[5] "In doubtful cases the law has to be construed on the presumption that national legislation did not intend to overrule International Law."  Kurt von Schuschnigg, *International Law: An Introduction to the Law of Peace* 63 (Bruce Pub. Co. 1959).

*Operational      Law      Handbook,      12-13,      (U.      S.      Army      2015),*
*http://www.loc.gov/rr/frd/Military_Law/pdf/operational-law-handbook_2015.pdf.*   Thus,
it is legally impossible under United States' interpretation of international law for
members of organizations found by the American Executive to be FTOs to be granted
combatant immunity.   Accordingly, if Pazara fought for an FTO, defendants are not
entitled to the lawful combatant immunity defense.

Defendants have proffered evidence that the organizations to which Pazara
belonged were not FTOs, and they argue that each of the *Lindh* factors weighs in favor of
a finding that Pazara fought as a lawful combatant.  The FSA and JMA had commanders
(*see* Doc. 390 at 27, n. 80), the government produced photos of Pazara wearing a uniform
and carrying a gun openly (Doc. 390 at 27, Ex. 2 at 4-6, Ex. 3), the group carried arms
openly and lived in barracks (Doc. 390, Ex. 1 at 7), and the FSA committed, at least
nominally, to follow the laws of war.  (Doc. 409, n. 21) (citing Nat'l Coal. of Syrian
Revolution & Opposition Forces, *FSA Proclamation of Principles*, https://goo.gl/7aJHdn.

Furthermore, defendants proffered evidence from their investigation that Pazara's
Bosnian unit was used largely for guard duty and was known to spend time on Facebook
or cooking.  (Doc. 390, Ex. 1 at 4-8).  On September 24, 2014, President Obama declared
JMA a "specially designated global terrorist," nine months after Pazara assertedly left the
group, and after the majority of the dates of the alleged conspiracy set out in the
indictment.  *See* U.S. Dep't of State, *Designation of Foreign Terrorist Fighters* (Sept. 24,
2014), https://goo.gl/nrSwUu; *see also* Doc. 1 at 15 (alleging money transfer dates
throughout 2013 and 2014, with the last dates possibly occurring on September 8, 20, or
25, 2014).

For purposes of defendants' motion to dismiss the indictment, the Court is bound
to consider only the allegations of criminal activity stated in the indictment, and it must
accept them as true.  Accordingly, defendants' motions to dismiss the indictment should
be denied.

20

However, the undersigned recommends that defendants be permitted to submit the lawful combatant immunity affirmative defense at trial.  The substantial factual disputes presented to the Court rest upon the identity of the group for which Pazara actually fought, when he did so, and whether it was a foreign terrorist organization, questions of fact that are properly reserved for a jury.  Defendants have produced reports that would enable a trier of fact to determine for whom Pazara fought and whether this organization was an FTO.

At trial, if the defendants offer evidence legally sufficient to sustain a finding of lawful combatant status by a preponderance of the evidence, the burden shifts to the government to disprove the lawful combatant affirmative defense beyond a reasonable doubt. *Norton*, 846 F.2d at 524.

## CONCLUSION

For the reasons set forth above,

**IT IS HEREBY ORDERED** that the motion of defendants for an evidentiary hearing (Doc. 415) **is denied as moot**.

**IT IS HEREBY RECOMMENDED** that the motions of defendants to dismiss the indictment based on the affirmative defense of lawful combatant immunity (Docs. 390, 393, 395) be **denied**.

**IT IS FURTHER RECOMMENDED** that defendants be permitted to present at trial evidence of the affirmative defense of lawful combatant immunity.

The parties have 21 days from the date of this Order and Recommendation to file documentary objections.  A motion for any extension of this period will be submitted to District Judge Catherine D. Perry for determination.

The failure to file timely documentary objections may waive the right to appeal issues of fact.

_____
**/s/   David D. Noce**
**UNITED STATES MAGISTRATE JUDGE**

Signed on May 9, 2018.

21