UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 4:15 CR 00049 CDP DDN |
| | ) | |
| | ) | |
| | ) | |
| RAMIZ ZIJAD HODZIC, | ) | |
| a/k/a Siki Ramiz Hodzic, | ) | |
| | ) | |
| SEDINA UNKIC HODZIC, | ) | |
| | ) | |
| NIHAD ROSIC, | ) | |
| a/k/a Yahya AbuAyesha Mudzahid, | ) | |
| | ) | |
| MEDIHA MEDY SALKICEVIC, | ) | |
| a/k/a Medy Ummuluna, | ) | |
| a/k/a Bosna Mexico, and | ) | |
| | ) | |
| ARMIN HARCEVIC, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## GOVERNMENT'S OBJECTIONS TO
## THE MAGISTRATE COURT'S ORDER AND RECOMMENDATION
## REGARDING LAWFUL COMBATANT IMMUNITY DEFENSE

Comes now the United States of America, by and through its attorneys, Jeffrey B. Jensen,

United States Attorney for the Eastern District of Missouri, and Matthew T. Drake, Howard J.

Marcus, and Kenneth R. Tihen, Assistant United States Attorneys for said District, and Joshua D.

Champagne, Trial Attorney for the United States Department of Justice, National Security

Division, Counterterrorism Section, and submit the following Objections to the Magistrate Court's Order and Recommendation Regarding Lawful Combatant Affirmative Defense, Doc. #429.

## I.      INTRODUCTION AND SUMMARY

### A.  Procedural Background

The Defendants moved the Court to dismiss the Indictment on the basis of combatant immunity. Docs. #390, 393, 395. The Government filed an Opposition. Doc. #404. The Defendants filed a Reply. Doc. #409. With leave of court, Doc. #412, the Government filed a Surreply, Doc. #414. Finally, the Defendants requested an evidentiary hearing. Doc. #415. During pretrial scheduling conferences, the parties also addressed holding a Motion hearing for argument on the applicable law.

The Magistrate Court issued two recommendations to this Court, in addition to denying the Defendants' request for an evidentiary hearing. Doc. #429. First, the Magistrate Court recommended that this Court deny the Defendants' Motions to Dismiss the Indictment. Second, the Magistrate Court recommended that this Court allow the Defendants to present at trial evidence of the affirmative defense of lawful combatant immunity. The Magistrate Court issued the Report and Recommendation without hearing argument or holding a Motion hearing on the applicable law. The Government agrees with and does not object to the Magistrate Court's first recommendation. The Government disagrees with and objects to the Magistrate Court's second recommendation.

As addressed in greater detail below, the Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135 (hereinafter, "GPW" or "Third Geneva Convention") is the legal authority governing lawful combatant immunity.  To the extent

the Magistrate Court relied on other legal bases to address combatant immunity as a defense, the Government objects.

### B.  Summary

In this case, the Magistrate Court concluded that the Defendants, who are accused of providing material support to violent jihadist fighters in Syria, could raise a combatant immunity defense at trial. That conclusion was error. The fighters the Defendants supported did not qualify for combatant immunity under the GPW. Prisoner-of-war protections under the GPW, including combatant immunity, apply only in the context of an *international* armed conflict, *i.e.*, a conflict between two States that are parties to the GPW. In this case, as the Magistrate correctly found, there is no dispute that the Defendants supported an individual, Abdullah Ramo Pazara (hereinafter, "Pazara"), who fought for *non-State* armed groups fighting in an armed conflict that, at the relevant time, was *not* an international armed conflict. These groups included Al-Qaeda in Iraq (hereinafter, "AQI"), also known by its aliases: Al-Nusrah Front, the Islamic State of Iraq and the Levant (hereinafter, "ISIL"), and the Islamic State of Iraq and Syria (hereinafter, "ISIS").  That undisputed finding forecloses the Defendants' combatant immunity claim as a matter of law. *See United States v. Hamidullin*, 888 F.3d 62, 71, 75 (4th Cir. 2018) (affirming the district court's refusal to allow a Taliban fighter to raise a combatant immunity defense because the defense applies only in international armed conflicts and the conflict in Afghanistan at the relevant time was non-international).

In reaching the opposite conclusion, the Magistrate Court disregarded the GPW standard for combatant immunity, which the Defendants admitted they could not satisfy. Instead, the Magistrate Court adopted the Defendants' broader framing of "common law" combatant immunity

based on Civil War-era case law that, according to the Defendants, allowed non-State insurgent groups to assert combatant immunity even in non-international armed conflicts.

The Magistrate Court's decision to adopt an extended "common law" theory of combatant immunity that sweeps beyond the GPW standard is wrong. First, the Magistrate Court's conclusion is unprecedented. It constitutes a significant departure from federal precedent, which recognizes that a defendant invoking a combatant immunity defense must satisfy the GPW criteria. As far as the Government is aware, every federal district court to have considered a combatant immunity defense since the adoption of the Geneva Conventions has analyzed the issue under the GPW standards. *See United States v. Hamidullin*, 114 F. Supp. 3d. 365, 387 (E.D. Va. 2015); *United States v. Hausa*, 258 F. Supp. 3d 265, 273 n.6 (E.D.N.Y. 2017); *United States v. Ahmed* et al., No. 15-CR-00049 (D. Minn. Feb. 10, 2016), Doc. #368, at *3-5; *United States v. Pineda*, 2006 WL 785287, at *2 (D.D.C. Mar. 28, 2006); *United States v. Arnaout*, 236 F. Supp. 2d 916, 917-18 (N.D. Ill. 2003); *United States v. Lindh*, 212 F. Supp. 2d 541, 553 (E.D. Va. 2002); *United States v. Shakur*, 690 F. Supp. 1291, 1298 (S.D.N.Y. 1988).

Second, and more importantly, the Magistrate's conclusion directly conflicts with *Hamidullin*, the only court of appeals decision that addresses the combatant immunity issue raised in this case. In *Hamidullin*, the Fourth Circuit explicitly held that the GPW, not the nineteenth-century common law jurisprudence relied on by the Magistrate Court, provides the currently governing standard for the combatant immunity defense in U.S. courts. *See* 888 F.3d at 75-76. The *Hamidullin* court considered, and rejected, the same, broad "common law" theory raised here, explaining that "[t]he principles reflected in the [pre-GPW] common law decisions" were "refined" and "codified" in the GPW, which "represents an international consensus" on the scope of combatant immunity. *Id.* For that reason, the GPW's "explicit[]" definition "of lawful   and

4

unlawful combatants is conclusive." *Id.* The court accordingly "decline[d] to broaden the scope of combatant immunity beyond the carefully constructed framework of the Geneva Convention." *Id.* at 76. The Magistrate Court, at the time of its decision, did not have the benefit of the Fourth Circuit's opinion – the only court of appeals decision on point – which provides a further compelling reason for this Court to consider the issue anew and decline to adopt the Magistrate Court's second recommendation.[1]

Finally, as the Fourth Circuit recognized, extending combatant immunity to non-State groups engaged in insurgencies against States would discourage those States from joining and honoring the GPW, thereby undermining the important humanitarian purposes it is designed to serve. *See Hamidullin*, 888 F.3d at 76 (recognizing that the GPW's "international consensus" on the "norms of treatment of prisoners" would "be eviscerated if common law principles were interpreted as superseding"). Moreover, applying combatant immunity beyond the GPW framework would inhibit the Government's ability to bring terrorists and other brutal insurgents to justice. *See id.* at 76 (recognizing that a "broad framing of common law combatant immunity would extend immunity far beyond the [GPW] to every person acting on behalf of an organization that claims sovereignty," including "terrorists operating on behalf of the Islamic State"); *see also id.* at 78 (Wilkinson, J., concurring) (cautioning against adoption of a rule that "would threaten to elevate every band of terrorists around the world to near nation-state status and, in so doing, to extend the protections of the [GPW] to those who both regularly and flagrantly violate its dictates"). The Defendants' sweeping expansion of combatant immunity, overriding the express

---

[1] While there was one dissenting opinion in *Hamidullin*, it did not find that combatant immunity applied in non-international armed conflicts, or otherwise embrace any of the Defendants' arguments. Rather, the dissent pertained to an Army Regulation that applies only to persons in the custody of the Department of Defense.  *Hamidullin*, 888 F.3d at 78 (King, J., dissenting). The dissent has no application to the instant case.

terms of the GPW, would require the United States to treat lawless insurgent groups, many of whom are responsible to no one but themselves, as if they were regular forces responsible to and controlled by a recognized State. For these reasons, this Court should reject the Defendants' sweeping version of "common law" combatant immunity, hold that the GPW provides the governing standard here, and find that the Defendants cannot satisfy that standard as a matter of law.

In order to present the combatant immunity defense to the jury, the Defendants must carry the burden of making a prima facie showing that they can establish the elements of combatant immunity. The Order and Recommendation notes that, "To raise an affirmative defense at trial, defendants must show substantial evidence on each element of the affirmative defense." Order and Recommendation at 10 (citing *United States v. Bailey*, 444 U.S. 394, 412 (1980); *United States v. Blankenship*, 67 F.3d 673, 678 (8th Cir. 1995). Here, the Defendants have failed to proffer facts that, even if true, would establish the elements of combatant immunity within the meaning of the GPW. Therefore, there is no question of fact to present to the jury. Furthermore, in consideration of the very facts the Defendants offered the Court, and in light of the consistent line of cases leading to the recent Fourth Circuit decision in *Hamidullin*, the Defendants cannot meet their burden, so this Court should rule as a matter of law that the Defendants are not entitled to combatant immunity and may not present that defense to the jury. 888 F.3d at 71, 75.

## II.   GOVERNING LAW AND LEGAL STANDARDS

### A.  New Authority

In briefs submitted to the Magistrate Court, the Government and the Defendants cited to the district court opinion in *Hamidullin*, as did the Magistrate Court in the Order and Recommendation. 114 F. Supp. 3d at 365.     On April 18, 2018, subsequent to the completed

6

briefing schedule and briefs being filed by the parties, the Fourth Circuit issued its decision in *Hamidullin*, 888 F.3d 62. The Fourth Circuit opinion confirmed and further developed the interpretation of lawful combatant immunity in the United States. That decision has direct application to the facts of this case.

Hamidullin was convicted in the Eastern District of Virginia for, among other things, providing and conspiring to provide material support to terrorists, in violation of 18 U.S.C. § 2339A. *Id.* at 64. These are the same charges levied against all the Defendants in this case (and two of the Defendants are also charged with conspiring to commit murder and maiming overseas, in violation of 18 U.S.C. § 956(a)). Hamidullin appealed his conviction, "contend[ing] that the district court erred in concluding that he was not entitled to combatant immunity under the [GPW], and that he did not qualify for the common law combatant immunity defense of public authority." *Id.* at 64-65.

The Fourth Circuit affirmed the conviction and concluded that Hamidullin was not entitled to combatant immunity. *Id.* at 65. As discussed in greater detail below, the Fourth Circuit found that the GPW provides the "conclusive" and "governing" standards for determining whether a defendant qualifies for combatant immunity. *Id.* at 75-76. The Fourth Circuit also held that the GPW superseded or displaced prior common law governing combatant immunity and the law concerning belligerency. *Id.* The Fourth Circuit further held that lawful combatant immunity is exclusively available in international armed conflicts and not in non-international armed conflicts. *Id.* at 69-71.[2] The persuasive holdings of *Hamidullin* are directly on point here and the same legal analysis should be applied to this case.

---

[2] International armed conflict is conflict between States, not merely a conflict that takes place on a global stage or straddling a border; non-international armed conflict is conflict not between

### B. The Elements of Lawful Combatant Immunity

1. <u>Overview</u>:

As outlined by the Fourth Circuit in *Hamidullin*, to assert a defense of combatant immunity successfully under modern jurisprudence, a private individual must meet the criteria outlined in the GPW. *Hamidullin*, 888 F.3d at 75 ("The [GPW] is the governing articulation of lawful combatant status."). The Fourth Circuit found that the GPW preempted the common law that came before it, and the GPW's, "definition of lawful and unlawful combatants is conclusive." *Id.* In the Eighth Circuit, the District of Minnesota likewise applied the GPW elements to resolve a question of combatant immunity. *Ahmed*, No. 15-CR-00049, at *3-5. In both *Hamidullin* and *Ahmed*, the courts applied the elements of the GPW and consistently decided that the GPW body of law is conclusive and controlling on the defense of combatant immunity. In this case, the Magistrate Court did not do so.

Indeed, all federal courts that have addressed combatant immunity since the adoption of the Geneva Conventions have held that the GPW is the basis to assert a defense of lawful combatant immunity. *Hamidullin*, 888 F.3d at 75-76 (rejecting combatant immunity claim under the GPW framework); *United States v. Hausa*, 258 F. Supp. 3d 265, 273 n.6 (E.D.N.Y. 2017) (same); *United States v. Pineda*, 2006 WL 785287, at *2 (D.D.C. Mar. 28, 2006) (same); *United States v. Arnaout*, 236 F. Supp. 2d 916, 917-18 (N.D. Ill. 2003) (same); *United States v. Lindh*, 212 F. Supp. 2d 541, 558 (E.D. Va. 2002) (same); *United States v. Shakur*, 690 F. Supp. 1291, 1298 (S.D.N.Y. 1988) (same).

---

States, for example, civil wars or conflicts between a State and a non-State group. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 628-29 (2006) (cited in *Hamidullin*, 888 F.3d at 68).

8

2.  Elements:

The GPW requires that to qualify for lawful combatant immunity status, a private individual must: (1) be engaged in an international armed conflict, GPW Art. 2; (2) belong to a "High Contracting Party," *i.e.*, a nation-State that is a party to the GPW, *id.*;[3] and, (3) if the first two criteria are met, the individual must also be a member of a force that qualifies for prisoner-of-war status under GPW Article 4(A).  As applied here, prisoner-of-war status means the four criteria set forth under GPW Article 4(A)(2).

In *Hamidullin*, the Fourth Circuit found that by 2009, when Hamidullin committed his crimes, "the conflict in Afghanistan had shifted from an international armed conflict between the United States and the Taliban-run Afghan government to a non-international armed conflict against unlawful Taliban insurgents." *Hamidullin*, 888 F.3d at 69. Because the Taliban did not constitute a State, the conflict was non-international. In the instant case, the question is whether the civil war in Syria between the Assad regime and various non-State groups constituted an international armed conflict during the date-range of the indictment. The individual in this case, Pazara, fought for non-State groups including Al-Qaeda in Iraq (hereinafter, "AQI"), also known by its aliases: Al-Nusrah Front, the Islamic State of Iraq and the Levant (hereinafter, "ISIL"), and the Islamic State of Iraq and Syria (hereinafter, "ISIS"). These groups were among a number of non-State groups fighting the Assad regime, *i.e.*, the Government of Syria.

---

[3] In this case as in *Hamidullin*, the first two elements essentially amount to the same question. That is, in a conflict where it is clear that there is a State on one side, the question becomes whether the opposing party is a State or a non-State. This answers the question whether the armed conflict is international or non-international. It also answers the question whether an individual fighting for the opposing party fought for a State or a non-State. For functional purposes, then, these first two elements are sometimes described interchangeably.

*Most importantly*, in this case the Defendants concede that the conflict in Syria was non-international. *See* The White House, Report on the Legal and Policy Frameworks Guiding the United States' Use of Military Force and Related National Security Operations at 17 n.81 (2016) (hereinafter, "White House Report") (stating that the United States was engaged only in non-international armed conflicts and that, "[b]y September 2014, the Syrian Government had lost effective control of much of eastern and northeastern Syria, with much of that territory under ISIL's control"). This ends the inquiry into the applicability of a lawful combatant immunity defense. As a matter of law, because this conflict was non-international, Pazara was not a lawful combatant pursuant to the GPW and, by extension, the Defendants are precluded from asserting the defense of combatant immunity.

If this *were* an international armed conflict, and if Pazara *had* fought for a High Contracting Party, then the test for combatant immunity would be whether Pazara would have been entitled to prisoner-of-war protections upon capture. That is, a person entitled to prisoner-of-war status under GPW Articles 2 and 4 is also entitled not to be prosecuted for lawful battlefield activity under GPW Articles 87 and 102. *Hamidullin*, 888 F.3d at 66-67 (citing GPW Arts. 2, 4, 87, 102).[4] As relevant here, the criteria are set forth under GPW Article 4(A)(2): the group(s) for which the combatant is fighting or affiliated with must act under the authority of a State (a High Contracting Party) that is a party to the conflict, and its members must (1) be commanded by a person responsible for his or her subordinates; (2) display a fixed distinctive sign; (3) carry arms openly; and (4) conduct operations in accordance with the laws and customs of war. GPW Art. 4(A)(2). *See also Ahmed*, No. 15-CR-00049, at *6 ("the Court finds that defendants have not met this

---

[4] For this reason, the Government uses the terms "prisoner-of-war" and "lawful combatant" interchangeably. "To the extent they exist, any differences between lawful combatants and [prisoners-of-war] are immaterial to our discussion here." *Hamidullin*, 888 F.3d at 67.

burden as they have not demonstrated that ISIL meets any of the criteria set forth in Article 4 that would extend them lawful combatant status").

The federal courts that have addressed combatant immunity claims have focused on the fact that the overall organization, not the individual defendant or his particular unit, did not satisfy the four criteria. *See* Mem. Op. and Order at 6, *Ahmed*, No. 15-CR-00049; *Lindh*, 212 F. Supp. 2d at 558 n.39 ("[w]hat matters for determination of lawful combatant status is not whether Lindh personally violated the laws and customs of war, but whether the Taliban did so"). In addition, as discussed below, the Government would offer evidence at trial that Pazara himself admitted that he participated in various violations of the law of armed conflict, such as taking prisoners and killing them, and holding individuals as slaves. He also admitted to being present at beheadings that were carried out by groups with which he was affiliated.

The elements of combatant immunity under the GPW are: (1) the defendant fought in an international armed conflict for an armed force that (2) belonged to a State, and (3) complied with the Article 4A(2) criteria. If those elements are satisfied, then the individual would be entitled to combatant immunity. *See* GPW Art. 87 (stating that prisoners-of-war "may not be sentenced . . . to any penalties except those provided for in respect of members of the armed forces of the [detaining] Power who have committed the same acts"); *id.* Art. 102 ("A prisoner of war can be validly sentenced only if the sentence has been pronounced by the same courts according to the same procedure as in the case of members of the armed forces of the Detaining Power, and if, furthermore, the provisions of the present Chapter have been observed.") (both Articles cited in *Hamidullin*, 888 F.3d at 67). In this case, the Defendants conceded that the conflict was non-international and that Pazara fought for non-State groups. This ends the inquiry, and combatant immunity is unavailable as a matter of law.

### C.  Burden of Proof

The Defendants bear the burden to establish the affirmative defense of combatant immunity. *See Lindh*, 212 F. Supp. 2d at 557 (holding that, "it is Lindh who bears the burden of establishing the affirmative defense that he is entitled to lawful combatant immunity", and citing in support *Mullaney v. Wilbur*, 421 U.S. 684, 697-99 (1975)); *see Ahmed*, No. 15-CR-00049, at *6 ("it is the defendant's burden to establish that they are entitled to lawful combatant immunity").

To raise the affirmative defense of combatant immunity the defendants must first make a *prima facie* showing that they can produce evidence on each element of the claimed affirmative defense. *See United States v. Bailey*, 444 U.S. 394, 412 n.9 (1980) (concluding the defendant must present evidence supporting his affirmative defense of duress or necessity before he is entitled to a jury instruction on the defense); *see also United States v. Jankowski*, 194 F.3d 878, 882 (8th Cir. 1999) ("Whether there is sufficient evidence to submit an affirmative defense to a jury is a question of law"); *United States v. Blankenship*, 67 F.3d 673, 678 (8th Cir. 1995) (upholding the district court's preclusion of a justification defense based on the insufficiency of the defendant's pretrial proffer); *United States v. May*, 727 F.2d 764, 765 (8th Cir. 1984) (holding that evidence supporting a defense may be struck if the defendant fails to present proof of *all* the elements); *United States v. Oz*, No. 13-CR-00273, 2017 WL 44941, at *4 (D. Minn. Jan. 4, 2017) (collecting cases).

In sum, evidence of a claimed defense may be excluded if the defendant's offer of proof on even one essential element is insufficient as a matter of law to support the claimed defense. *Bailey*, 444 U.S. at 416. Here, the Defendants have clearly failed to even attempt to proffer evidence on the correct elements of the lawful combatant immunity defense.  Therefore, this Court should not allow presentation of that defense to the jury.

### D.  Facts of the Case

In briefs filed with the Court, the parties are in agreement on numerous facts. Abdullah Ramo Pazara became a naturalized United States citizen in May 2013.  On or about May 28, 2013, Pazara left the United States and eventually travelled to Syria, arriving in or about July 2013. Pazara remained in Syria and the surrounding region from in or about July 2013 until his death in September 2014. Beginning at a time unknown, but continuing from at least July 2013 until after September 2014, Syria was engaged in civil war, *see* Def. Mot. to Dismiss, Doc. #390 at 3, that was also a non-international armed conflict, *see* Def. Reply, Doc. #409 at 2, 3, and Pazara participated in this conflict.

The Indictment in this case alleges, and the Government would offer evidence at trial that, Pazara participated in the conflict in Syria and the surrounding region. He met and joined with other persons from Bosnia, Montenegro, and elsewhere. Those individuals affiliated themselves with, and fought for, groups and organizations that were engaged in the non-international armed conflict. These groups included Al-Qaeda in Iraq (hereinafter, "AQI"), also known by its aliases: Al-Nusrah Front, the Islamic State of Iraq and the Levant (hereinafter, "ISIL"), and the Islamic State of Iraq and Syria (hereinafter, "ISIS"). Al-Qaeda in Iraq, also known by its aliases, is a designated foreign terrorist organization (hereinafter, "FTO"). No group for which Pazara fought was a State recognized by the United States or a High Contracting Party to the GPW, nor did any of those groups satisfy the criteria for prisoner-of-war status under Article 4 of the  GPW.

The Indictment further alleges, and the Government would also offer evidence at trial, that Pazara and his associates engaged in acts of violence that included murder and conspiracy to commit murder outside the United States, specifically in Syria and the surrounding region.  Pazara, his associates, and the groups for whom they fought took prisoners and killed them.    They held

some individuals as slaves. In these ways and numerous others, Pazara individually, and the groups for which he fought, did not conduct operations in accordance with the laws and customs of war. On the four prisoner-of-war criteria under GPW Article 4(A)(2), the Defendants have not proffered facts to show that Pazara fought for a group entitled to prisoner-of-war status.

The parties and the Magistrate Court all agree on the facts that are pertinent to combatant immunity under the GPW: First, Pazara fought in a non-international armed conflict. Second, Pazara, an American citizen, fought for non-State groups in Syria. The Government does not concede that other facts proffered by the Defendants are actually correct. However, most of the Defendants' facts are not relevant to the combatant immunity question. The Defendants conceded that Pazara fought in a non-international armed conflict and that he did not fight for a GPW High Contracting Party. GPW Art. 2. The Magistrate Court agreed. Therefore, the legal analysis is concluded and Pazara cannot be considered a lawful combatant affording him immunity.[5]

In summary, based on these facts alone, and applying the elements of the GPW as discussed and set forth by the Fourth Circuit in *Hamidullin,* the Defendants in this case are not entitled to assert the defense of combatant immunity as a matter of law.

## III.    OBJECTIONS

The Government notes the following objections to the Order and Recommendation.

### A.   This Court Should Find That the Third Geneva Convention ("GPW") Provides the Governing Standard for Lawful Combatant Immunity

The Order and Recommendation poses this as one of the questions pending before this Court: "if [the Syrian conflict] is not an [international armed conflict], whether United States

---

[5] The Defendants did not proffer facts to support the prisoner-of-war elements either, *see* GPW Art. 4(A)(2), though the Court need not reach the question of prisoner-of-war status because the inquiry is over once the Defendants concede the conflict in Syria was, at the relevant times, a non-international armed conflict.

interpretation of international law would nonetheless apply lawful combatant immunity protections to it." Order and Recommendation at 10. The answer is no.  The GPW is *the* source of contemporary combatant immunity doctrine. "The current doctrine of combatant immunity is codified in the [GPW]." *Hamidullin*, 888 F.3d at 66.

All federal courts to address the issue of combatant immunity since the adoption of the GPW have done so under the rubric of the GPW, to which the U.S. is a signatory. *See supra* at 4, 8. In that time, *no* federal court has applied the Defendants' broader framing of "common law" combatant immunity which, according to the Defendants, allowed non-State insurgent groups to assert combatant immunity even in non-international armed conflicts.

The Order and Recommendation found, and the parties agree, that the conflict in Syria in which Pazara was engaged was a non-international armed conflict.  However, unlike  any other U.S. court to have addressed combatant immunity since the GPW codified the relevant standard, the Order and Recommendation also stated, "a cardinal question for the Court is whether the Syrian conflict constitutes a belligerency or otherwise warrants the conferral of lawful combatant immunity protections."  Order and Recommendation at 14.  By posing this question, the Magistrate Court considered whether there may be a broader framing of "common law" combatant immunity outside the elements articulated in the GPW. There is not. The Fourth Circuit in *Hamidullin* rejected the proposed extension of common law that the Defendants' advance here, and this Court should reach the same conclusion.

The Defendants' broad interpretation of common law, to the extent it has any basis in the cases, has been superseded by the GPW. *Hamidullin*, 888 F.3d at 75 ("The principles reflected in the common law decisions cited by Hamidullin were refined and collected in 20th century efforts to codify the international law of war that resulted in the [GPW]."). Importantly, the GPW

preempted common law principles that preceded it. *Id.* at 75-76. The law of armed conflict codified in the GPW took the place of the law of belligerency referred to in the Defendants' filings and in the Order and Recommendation. Indeed, the Fourth Circuit noted on numerous occasions that Hamidullin argued he was entitled to combatant immunity on two independent bases: the GPW and common law. *Hamidullin*, 888 F.3d at 64, 65, 74, 75, 76. The court specifically and soundly rejected the notion that there is common law combatant immunity outside the GPW.

The Government does not aim to bar the Defendants from putting on a defense at trial, or offering relevant evidence at such a trial. However, as it relates to lawful combatant immunity, the Defendants rely on an incorrect source of law and have not offered proof on the actual elements of combatant immunity.

### B. This Court Should Find That the GPW Only Extends Immunity in International Armed Conflicts

The Order and Recommendation stated, "[L]awful combatant protections are not exclusively reserved for those fighting in [international armed conflicts]." Order and Recommendation at 9. On the contrary, lawful combatant immunity is exclusively reserved for those fighting in international armed conflicts.[6]

The GPW deliberately distinguishes between protections afforded in international armed conflicts (conflicts between states, addressed in Article 2 common to all four Geneva Conventions, sometimes called Common Article 2) and protections afforded in non-international armed conflicts (conflicts not between states, such as civil wars or conflicts between a state and a non-state group,

---

[6] Even in a non-international armed conflict, there may be circumstances in which members of the armed forces of a State may benefit from immunity with respect to actions authorized by that State. *See* Department of Defense Law of War Manual (Dec. 2016) ¶ 17.4.1.1 n.77. Any such exception plainly does not apply here, where the defendant does not allege that he is a member of a State's armed forces. The updated Law of War Manual is publicly available at the "News" tab on www.Defense.gov under "Publications."

Article 3 or Common Article 3).      *Hamdan v. Rumsfeld*, 548 U.S. 557, 628-29 (2006) (cited in *Hamidullin*, 888 F.3d at 68).

The Fourth Circuit in *Hamidullin* reaffirmed that the GPW provides the elements of combatant immunity, and this immunity is *only* available in international armed conflicts. This is contrary to the Magistrate Court's recommendation. By concluding that combatant immunity reached non-international armed conflicts, the Order and Recommendation derailed the correct legal analysis of combatant immunity. Rather than be drawn in to a needlessly fact-intensive inquiry, this Court can resolve the question of combatant immunity under the discrete first step of the analysis by recognizing that the armed conflict in Syria in which Pazara was fighting was a non-international armed conflict.

In *Hamidullin*, the court rejected the combatant immunity claim on the ground that, at the time of Hamidullin's conduct, the Taliban was no longer a State and the conflict between the Taliban and the U.S. was a non-international armed conflict. *See Hamidullin*, 888 F.3d at 69-71. As the court explained, although the conflict began in 2001 as a war between the U.S. and the Taliban-controlled Afghan government, by 2009 the Taliban had been replaced by a new government, and the war had become a non-international armed conflict between the new Afghan government and its allies (including the U.S.) on one side and unlawful Taliban insurgents on the other. The court concluded that Hamidullin, as a fighter for a non-State insurgency in a non-international armed conflict, was not entitled to combatant immunity under the GPW. *Id.* This Court should reach the same conclusion here.

Consequently, under the GPW, the argument about combatant immunity is over as soon as the Court determines that the conflict was a non-international armed conflict. As the parties agreed in this case, the Syrian conflict was a civil war and a non-international armed conflict. Under all

17

existing applications of federal law since the United States' adoption of the GPW, the result is that combatant immunity is unavailable.

### C. This Court Should Find That the GPW Does Not Invite States to Extend Immunity to Combatants Not Entitled to Immunity

The Order and Recommendation stated, "The GPW makes lawful combatant immunity protections applicable to fighters in [non-international armed conflicts] '*as a minimum*,' and encourages signatory states to extend such protections to [non-international armed conflicts]." Order and Recommendation at 9 (citation and parenthetical omitted), *see also id.* at 16.  The Order and Recommendation here mixes references to GPW Article 2 (combatant immunity in international armed conflicts) and GPW Article 3 (baseline humanitarian protections in non-international armed conflicts that are guaranteed "as a minimum"). Article 2 combatant immunity is the maximum protection, reserved for a State's soldiers in an international armed conflict.  Under Article 3, combatant immunity does not apply to non-international armed conflicts at all, much less as a minimum. Instead, Article 3 expressly provides that parties to such an armed conflict may prosecute captured fighters before a "regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." *See Hamdan,* 548 U.S. at 631-32; *Hamidullin*, 888 F.3d at 75.  Article III courts meet that standard.

GPW Article 3 guarantees baseline humanitarian treatment upon capture. *See Hamdan*, 548 U.S. at 630-31 (2006).[7] Critically, "Under Article 3, however, there is no provision entitling combatants captured during non-international armed conflicts to [prisoner-of-war] status or the

---

[7] Among other things, Article 3 guarantees, "as a minimum," that detainees in non-international armed conflicts may not be discriminated against on the basis of race or religion, may not be subjected to violence, may not be subjected to "outrages upon personal dignity," may not be tried except in a "regularly constituted court," etc.  GPW, Art. 3.

resulting combatant immunity." *Hamidullin*, 888 F.3d at 71. Even if the GPW "encourages" States to consider providing better-than-minimum treatment, this is not the controlling legal framework of the GPW, and it only pertains to treatment, and not to upgrading legal status of combatants such as by awarding legal immunities. No court has interpreted the Article 3 "as a minimum" provision regarding treatment to apply to Article 2 provision of combatant immunity. If this clause meant what the Defendants argue it does, then the GPW would be inviting States to immunize lawless insurgent groups.[8]

Of course a State could, in exercise of prosecutorial discretion, decline to prosecute a particular combatant or member of a particular non-State armed group; but to declare a non-State fighter is immune under the Geneva Convention would directly conflict with the dictates of Article 2 as discussed above.

Indeed, to the extent Article 3 does address the legal status of parties to a conflict, it emphasizes that treating detainees humanely does not trigger an upgrade in legal status. Article 3 provides, "The application of the preceding provisions [in Article 3] *shall not affect the legal status of the Parties to the conflict*." GPW, Art. 3 ¶ 2 (emphasis added). In other words, when States adhere to their Article 3 obligations, they do so with assurance that this will *not* endow fighters in a non-international armed conflict with an elevated legal status, such as the prisoner-of-war status (and the concomitant combatant immunity) that States reserved for those acting under State authority.

---

[8] When the Defendants made this argument in their briefings, they relied on the International Committee of the Red Cross (hereinafter, "ICRC") Commentary to the GPW. The ICRC position is not controlling law. Even the Defendants' source belies their argument: "only in international armed conflicts does [International Humanitarian Law] provide combatant (and prisoner-of-war) status to members of the armed forces." Int'l Comm. of the Red Cross, International Humanitarian Law and the Challenges of Contemporary Armed Conflicts, at 726 (2007).

As discussed above, the GPW draws a bright line between international and non-international armed conflicts. The High Contracting Parties that adopted the GPW, including the United States, intended for combatant immunity to apply only in (1) international armed conflicts, (2) to groups that act on behalf of High Contracting Parties, (3) when the groups also fall within the Article 4 criteria for prisoner-of-war status. GPW Arts. 2, 4. Until there are internationally-ratified amendments to the GPW, combatant immunity remains a protection that is only afforded to certain participants in international armed conflicts. *See Hamidullin*, 888 F.3d at 78 (Wilkinson, J., concurring) (cautioning against adoption of a rule that "would threaten to elevate every band of terrorists around the world to near nation-state status and, in so doing, to extend the protections of the [GPW] to those who both regularly and flagrantly violate its dictates"). This Court should conclude that neither Article 3 nor any provision of the GPW encourages States to grant combatant immunity where a defendant is not entitled to it.

**D. This Court Should Find That Fighting for a Designated Foreign Terrorist Organization is a Sufficient but Not Necessary Condition that Defeats a Claim of Combatant Immunity**

The Order and Recommendation stated, "courts have consistently denied combatant immunity to members of designated foreign terrorist organizations, who did not qualify for lawful combatant status under the GPW." Order and Recommendation at 9 (citing *United States v. Hamidullin*, 114 F. Supp. 3d 365, 380-81 (E.D. Va. 2015); *United States v. Lindh*, 212 F. Supp. 2d 541, 558 (E.D. Va. 2002). This is of course correct, because no defendant charged with fighting for a designated foreign terrorist organization has succeeded in asserting lawful combatant immunity, for the reasons outlined in the Government's Opposition, Doc. #404 at 22-26. The District of Minnesota made the same finding in *United States v. Ahmed*, concluding,

> Even if that were true, that ISIL has become more than a terrorist organization, the
> fact remains that ISIL **is** a designated a foreign terrorist organization and defendants
> are charged in the Indictment with conspiring with ISIL to commit murder in the
> context of terrorist activities. Under these circumstances, combatant immunity does
> not apply.

No. 15-CR-00049, at *8 (bold emphasis in original).

The Government has alleged that Pazara was affiliated with and fought for a designated
FTO, namely Al-Qaeda in Iraq, also known by its aliases Al-Nusrah Front, ISIL, and ISIS.
Fighting for an FTO makes combatant immunity categorically unavailable. However, the
Government need not prove that Pazara fought for a designated FTO in order to show that he was
not entitled to combatant immunity. The outcome of the cases cited by the Order and
Recommendation – *Hamidullin* and *Lindh* – did not hinge on whether the defendant fought for an
FTO. Contrary to the suggestion of the Order and Recommendation at 9, *Hamidullin* and *Lindh*
involved ordinary analysis of the GPW elements (international armed conflict and prisoner-of-war
status under GPW Articles 2 and 4) and did not involve analysis of whether the defendants fought
for FTOs at all.  *Hamidullin*, 888 F.3d at 75-76; *Lindh*, 212 F. Supp. 2d at 553-54.

Hamidullin lost his bid for combatant immunity even though he was not accused of fighting
for an FTO.  Hamidullin was affiliated with the Taliban (which has never been designated an FTO)
and the Haqqani Network (which was not an FTO at the time of Hamidullin's crimes in 2009
though it was later designated in 2012).  *See Hamidullin*, 888 F.3d at 65; 77 Fed. Reg. 58203 (Sep.
19, 2012). Hamidullin's claim failed in the district court because he did not qualify for prisoner-
of-war status and failed in the Fourth Circuit because the conflict was non-international.[9]

---

[9] The district court did not reach the question of whether Hamidullin fought in an international
armed conflict. As discussed above, the Fourth Circuit did reach that question, and found that the
conflict was non-international, and therefore the Court affirmed the district court's conclusion that
Hamidullin was not entitled to combatant immunity.  The Fourth Circuit's more direct  analytical

Similarly, John Walker Lindh did not seek combatant immunity with respect to the allegations that he supported al Qaeda. He only sought combatant immunity with respect to his status as a Taliban member.  As the district court noted in that case,

> Lindh makes no claim of lawful combatant immunity with respect to the Indictment's allegations that he was a member or soldier of al Qaeda. Instead, Lindh focuses his lawful combatant immunity argument solely on the Indictment's allegations that he was a Taliban member. This focus is understandable as there is no plausible claim of lawful combatant immunity in connection with al Qaeda membership. Thus, it appears that Lindh's goal is to win lawful combatant immunity with respect to the Taliban allegations and then to dispute factually the Indictment's allegations that he was a member of al Qaeda.

*United States v. Lindh*, 212 F. Supp. 2d 541, 552 n.16 (E.D. Va. 2002).

As is clear in *Lindh* and *Hamidullin*, simply the fact that someone fights for a non-FTO group does not relieve him or her of the requirements of the GPW in order to qualify for combatant immunity. This proposition matters in light of two of the Order and Recommendation's pronouncements.

First, the Order and Recommendation states:

> Defendants' entitlement to invoke the lawful combatant immunity affirmative defense depends ultimately on the question, For which faction of the Syrian opposition did Abdullah Ramo Pazara actually fight?

Order and Recommendation at 18.

Second, the Order and Recommendation states:

> The substantial factual disputes presented to the Court rest upon the identity of the group for which Pazara actually fought, when he did so, and whether it was a foreign terrorist organization, questions of fact that are properly reserved for a jury.

*Id.* at 21.

---

path avoided a needlessly fact-intensive inquiry about the non-State groups' compliance with the Article 4(A)(2) criteria.

Both of the preceding pronouncements are incorrect because the factual disputes asserted by the Defendants are immaterial to the legal determination at issue. Even if Pazara had fought for the non-FTO groups as claimed by the Defendants, he still would *not* have been entitled to prisoner-of-war status and combatant immunity. There is no question of fact to present to the jury and the Court should rule that, as a matter of law, these Defendants are not entitled to combatant immunity.

Fighting for a designated foreign terrorist organization is a sufficient but not necessary condition that defeats a claim of combatant immunity. The burden is on the Defendants to show how the group(s) involved meet the elements of and qualify for the protections afforded by the GPW; there is no burden on the Government to prove the Defendant fought for an FTO.[10] Because the Defendants, the Government, and the Magistrate Court all concluded that the conflict in Syria was a non-international armed conflict, the inquiry is over, and the defense does not apply. Further, Pazara did not fight for a State or High Contracting Party to the GPW and similarly, the inquiry is over on this independent analysis as well, and the defense does not apply.

### E.  This Court Should Find That the United States Has Not Recognized Any Change in the Sovereignty or Government of the State of Syria

The Order and Recommendation states, "The United States recognized the Syrian opposition and its claim to *de jure* sovereignty as superior to that of the Assad regime during the periods relevant to the indictment." Order and Recommendation at 17. This is not the case, as addressed above and in the Government's Opposition, Doc. #404 at 31-34, and in the Government's Surreply, Doc. #414 at 7-8.

---

[10] If the Grand Jury were to return a superseding indictment alleging a violation of 18 U.S.C. § 2339B (providing material support to a designated FTO), the Government would need to prove at trial that Pazara fought for an FTO (or that the Defendants at least believed he was fighting for an FTO, in the case of an attempt or conspiracy).

The Defendants argued, in essence, that because President Obama voiced political support for some groups within the Syrian Opposition Coalition, the Syrian Civil War was thereby transformed into what the Defendants call "legitimate warfare." Therefore, the Defendants argued, the members of such groups are "legitimate" and consequently immune from prosecution. On the contrary, President Obama's words of political support for some opposition groups in Syria did not transform those groups into a State, nor confer legal immunities upon them. The only way to qualify for combatant immunity is by satisfying the elements of the GPW. If the United States made statements of support for one side of a non-international armed conflict, this would not transform that conflict into an international armed conflict within the meaning of the GPW. In colloquial terms, a civil war does not automatically become a war between States when foreign leaders express praise for some of the non-State parties. A statement of political support for some groups in a civil war is a nullity when it comes to assessing combatant immunity.

In any event, to the extent there is any question as to the recognition of foreign governments, this Court should defer to the determination of the Executive Branch regarding recognition of foreign governments. *See Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2087 (2015) ("The Executive has exclusive and unreviewable authority to recognize foreign sovereigns."). The Executive Branch has not recognized any non-State group as having supplanted the government of Syria; this is entirely consistent with the Executive Branch conclusion that during the relevant period the United States was engaged only in non-international armed conflicts. *See* White House Report at 17 n.81 (2016).

Moreover, the Order and Recommendation states, "The American Executive granted a United States non-profit organization a license to support the FSA." Order and Recommendation at 17. Even if this is the case, the existence of such a license would strongly highlight that Pazara

himself did not have the permission of an OFAC license, much less permission to engage in lethal violence.  *See* Government's Surreply, Doc. #414 at 9-10.

## IV.     CONCLUSION

The Defendants have not proffered facts that, even if true, would establish the elements of combatant immunity. For that reason, there is no question of fact to present to the jury and the Court should rule that, as a matter of law, these Defendants are not entitled to combatant immunity.

The Court should conclude, consistent with all other courts that have analyzed this issue, that the GPW provides the contemporary governing standard for combatant immunity. Accordingly, the Court should reject the Defendants' attempt to expand combatant immunity beyond the terms of the GPW. The Court should also conclude that any factual disputes raised by the Defendants do not support their combatant immunity claims, *i.e.*, the Defendants have not proffered facts that, if true, would meet the elements of combatant immunity under the GPW.

**WHEREFORE**, for all of the foregoing reasons, the Government respectfully requests this Honorable Court:

ADOPT the Magistrate Court's recommendation that the Motions of Defendants to Dismiss the Indictment based on the affirmative defense of lawful combatant immunity be denied;

DECLINE the Magistrate Court's recommendation that Defendants be permitted to present at trial evidence of the affirmative defense of lawful combatant immunity; and

HOLD that the Defendants are not entitled to present evidence at trial of the defense of lawful combatant immunity.

Respectfully Submitted,

JEFFREY B. JENSEN
United States Attorney


*/s/ Matthew T. Drake*
MATTHEW T. DRAKE – 46499MO
Assistant United States Attorney


*/s/ Howard J. Marcus*
HOWARD J. MARCUS – 29756MO
Assistant United States Attorney


*/s/ Kenneth R. Tihen*
KENNETH R. TIHEN – 37325MO
Assistant United States Attorney


*/s/ Joshua D. Champagne*
JOSHUA D. CHAMPAGNE – 1013246DC
Trial Attorney – NSD/Department of Justice
Counterterrorism Section


## CERTIFICATE OF SERVICE

I hereby certify that on May 30, 2018, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon counsel of record.


*/s/ Matthew T. Drake*
MATTHEW T. DRAKE – 46499MO
Assistant United States Attorney